# UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF ILLINOIS

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

The residence and curtilage located at
1232 Harrison Street
Edwardsville, IL 62025
Including a white Ford F150 and any outbuildings, computers or computer-related media
(see Attachments A and B)

FILED
JAN 15 2013
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

Case Number: 13-mj-3007-DGW

I, Michael Lybarger being duly sworn depose and say:

I am a(n) Special Federal Officer deputized by the United States Marshals Service and have reason to believe
Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

See Attachment A

in the Southern District of Illinois
there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

property that constitutes evidence and instrumentalities of the commission of a criminal offense

concerning a violation of Title 18 United States code, Section(s) 2252(a) and 2252A
The facts to support a finding of probable cause are as follows:

See Attached Affidavit

Continued on the attached sheet and made a part hereof: ☑ Yes ☐ No

[signature]
Signature of Affiant

Sworn to before me and subscribed in my presence,

1/15/2012 at East St. Louis, Illinois
Date City State

DONALD G. WILKERSON, U.S. MAGISTRATE JUDGE
Name of Judge Title of Judge

[signature]
Signature of Judge

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE SOUTHERN DISTRICT OF ILLINOIS

In the Matter of the Search of )
The residence and curtilage located at )
**1232 Harrison Street** )
**Edwardsville, IL 62025** )
Including a white Ford F150 and any outbuildings, )
computers or computer-related media as further )
described in Attachments A and B )

NO. 13-mj-3007-DGW

FILED UNDER SEAL

**AFFIDAVIT**

I, Michael Lybarger, having been duly sworn, hereby depose and state as follows:

1. I am a Detective with the Edwardsville Police Department and have been so employed for approximately 15 years. I am also a Special Federal Officer deputized by the United States Marshals Service to conduct investigations involving the victimization of children. I am currently a member of the United States Secret Service – Southern Illinois Cyber-crime Unit and the Illinois Attorney General's Internet Crimes Against Children Task Force. As part of my regular duties, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2252(a) and 2252A.

2. I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media. My training includes 192 hours of training sponsored by the United States Secret Service on digital evidence and computer forensics examinations. I have over 400 hours of training specific to computer forensics and computer investigations from the National White Collar Crime Center, the Illinois Crimes Against Children Task Force, and Department of Defense Cyber Crimes Center. I have also participated in the execution of numerous search warrants, some of which involved child exploitation and/or child pornography offenses. I hold a Bachelor of Arts degree in Information Technology from Lindenwood University.

3. I am investigating the activities of an Internet Protocol (IP) address registered to Chris Hill at the following address: **1232 Harrison Street, Edwardsville, Illinois, 62025**. As will be shown below, there is probable cause to believe that someone has used that IP address to transport, distribute, receive, and/or possess child pornography, in violation of 18 U.S.C. §§ 2252 and 2252A.

4. I submit this application and affidavit in support of a search warrant authorizing a search of the residence and curtilage located at 1232 Harrison Street, Edwardsville, Illinois, 62025, including any outbuildings, vehicles, computers, or computer-related storage

devices found thereon, as further described in **Attachment A** (the "SUBJECT PREMISES"). I am also seeking authority to seize on and within the SUBJECT PREMISES the items specified in **Attachment B**, which may constitute evidence, fruits, and instrumentalities of the foregoing criminal violations.

5. The statements contained in this affidavit are based upon my training and experience as a Special Federal Officer of the United States Secret Service, information provided to me by other law enforcement officers and investigators, and information I have obtained through consultation with personnel trained in the investigation, seizure, and analysis of computers, electronic data, and electronic media.

6. Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252 and 2252A are present on the SUBJECT PREMISES.

## STATUTORY AUTHORITY

7. This investigation concerns alleged violations of Title 18, United States Code, Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors.

8. 18 U.S.C. § 2252(a)(1) prohibits a person from knowingly transporting or shipping in interstate or foreign commerce, by computer or mail, any visual depiction of minors engaging in sexually explicit conduct.

9. Under 18 U.S.C. § 2252(a)(2), it is a federal crime for any person to knowingly receive or distribute, by computer or mail, any visual depiction of minors engaging in sexually explicit conduct that has been mailed or shipped or transported in interstate or foreign commerce. That section also makes it a federal crime for any person to knowingly reproduce any visual depiction of minors engaging in sexually explicit conduct for distribution in interstate or foreign commerce by any means, including by computer or the mail.

10. Under 18 U.S.C. § 2252(a)(4), it is also a crime for a person to possess one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been transported in interstate or foreign commerce or that were produced using materials that had traveled in interstate or foreign commerce.

11. 18 U.S.C. § 2252A(a)(1) prohibits a person from knowingly mailing, transporting, or shipping child pornography using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer.

12. 18 U.S.C. § 2252A(a)(2) prohibits a person from knowingly receiving or distributing any child pornography that has been mailed, or using any means or facility of interstate or

foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

13. 18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing or accessing with intent to view any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped and transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer.

**DEFINITIONS**

14. "Child Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene and that do not depict minors engaging in sexually explicit conduct.

15. "Child Pornography," as used herein, means any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. See 18 U.S.C. § 2256(8).

16. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

17. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See 18 U.S.C. § 2256(2).

18. "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such devices." For purposes of this search warrant, the term "computer" also encompasses computer software and data security devices.

19. "Computer-related media," as used herein, encompasses all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data, including any data-processing devices (such as central processing units, internal drives, and fixed disks); peripheral storage devices (such as external hard drives, floppy diskettes, compact discs (CDs), digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), memory cards, Subscriber

Identity Module ("SIM") cards, and USB thumb drives); peripheral input/output devices (such as modems, routers, keyboards, printers, scanners, copiers, monitors, webcams, digital cameras, digital music players, cell phones, and video game consoles); as well as related equipment (such as cables and connectors).

20. "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

21. "Data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

22. "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

23. "Minor" means any person under the age of 18 years. See 18 U.S.C. § 2256(1).

24. "Peer-to-peer" or "P2P" file-sharing is a method of communication available to Internet users through the use of special software. Computers linked together through the Internet using this software form a network that allows for the sharing of digital files between users on the network. A user first obtains the P2P software, which can be downloaded from the Internet. In general, P2P software allows the user to set up files on a computer to be shared with others running compatible P2P software. A user obtains files by opening the P2P software on the user's computer, and conducting searches for files that are currently being shared on another user's computer.

25. The phrase "records, documents, and materials" includes all information recorded in any form by any means, whether in handmade form (such as writings, drawings, or paintings), photographic form (such as developed film, print-outs, slides, negatives,or magazines), type-written form (such as print-outs, books, pamphlets, or other typed documents); audio/visual form (such as tape-recordings, videotapes, DVDs, or CDs), or electronic form (such as digital data files, file properties, computer logs, or computer settings).

## COMPUTERS AND CHILD PORNOGRAPHY

26. Based on my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, computers, computer technology, and the Internet have revolutionized the way in which child pornography is produced and distributed.

27. Computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage.

28. With digital cameras, images of child pornography can be created with or transferred directly onto a computer. A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Through the Internet, electronic contact can be made to literally millions of computers around the world.

29. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of hard drives used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

30. The Internet affords individuals several different venues for meeting each other, obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

31. Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography can sometimes be found on the user's computer, and even when online storage is used, it is still possible to find evidence of child pornography activity on the user's computer.

32. As with most digital technology, communications made from a computer are often saved or stored on that computer. Storing this information can be intentional, for example, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others.

33. The Internet can be accessed through the use of a router. Routers often store important information about other computers that have obtained Internet access through them. A wireless router is a device that performs the functions of a router without the need for a cabled connection. If an unauthorized user obtains access to the Internet via another

person's wireless router, evidence of the unauthorized access can often be found on the router itself.

34. In addition to electronic communications, a computer user's Internet activities generally leave traces in a computer's web cache and Internet history files. A forensic examiner often can recover evidence that shows whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files that were uploaded or downloaded. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools.

35. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed and more on a particular user's operating system, storage capacity, and computer habits.

36. Even when a file has been overwritten, an examination of digital data on the hard drive can sometimes reveal evidence that the file was once on the hard drive but has since been deleted or edited, or it could reveal a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, email programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripheral storage devices and times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.

37. Further, evidence of how a digital device has been used, what it has been used for, and who has used it may be learned from the <u>absence</u> of particular data on a digital device. Specifically, the lack of computer security software, virus protection, malicious software, evidence of remote control by another computer system, or other programs or software may assist in identifying the user indirectly and may provide evidence excluding other causes for the presence or absence of items sought by this application. Additionally,

since computer drives may store artifacts from the installation of software programs that are no longer active, evidence of the historical presence of the kind of software and data described may have special significance in establishing timelines of usage, confirming the identification of certain users, establishing a point of reference for usage, and, in some cases, assisting in the identification of certain users.

**PEER TO PEER (P2P) FILE SHARING**

38. Peer to Peer (P2P) file sharing computer software programs are a standard way to transfer files from one computer system to another while connected to a network, usually the Internet. P2P file sharing programs allow groups of computers using the same file sharing network and protocols to connect directly to each other to share files. Many P2P file sharing networks are designed to allow users to download files and frequently provide enhanced capabilities to reward the sharing of files by providing reduced wait periods, higher user ratings, or other benefits. In some instances, users are not allowed to download files if they are not sharing files. Typically, settings within these programs control sharing thresholds.

39. I know from my training and experience that P2P file sharing networks are frequently used to trade digital files of child pornography. These files include both image and movie files.

40. There are several P2P networks currently operating (e.g., Gnutella, e-Donkey, Ares) and several different software applications that can be used to access these networks (e.g., e-Mule, Bearshare and Phex), but these applications operate in essentially the same manner.

41. During the default installation of most P2P software applications, settings are established which configure the host computer to share files. Depending upon the software application used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed. Typically, there are settings that allow the user to establish the location of one or more directories or folders whose contents (files) are made available for distribution to other network users and to control (a) whether or not files are made available for distribution to other network users; (b) whether or not other network users can obtain a list of the files being shared by the host computer; and (c) whether or not users will be able to share portions of a file while they are in the process of downloading the entire file. This feature increases the efficiency of the network by putting more copies of file segments on the network for distribution.

42. To access the P2P networks, a user first obtains the P2P software, which can be downloaded from the Internet. This software is used for the purpose of sharing digital files. When the P2P software is installed on a computer, the user is directed to specify a "shared" folder. All files placed in that user's "shared" folder are available to anyone on the world-wide network for download. Most P2P software gives each user a rating based on the number of files he is contributing to the network. This rating affects the user's ability to download files. The more files a user is sharing, the greater his ability is to

download files. This rating system is intended to encourage users to "share" their files, thus propagating the P2P network. However, a user is not required to share files to utilize the P2P network.

43.  A user generally obtains files by conducting keyword searches of the P2P network. When a user initially logs onto the P2P network, a list of the files that the user is sharing is transmitted to the network. The P2P software then matches files in these file lists to keyword search requests from other users. A user looking to download files simply conducts a keyword search. The results of the keyword search are displayed and the user then affirmatively selects file(s) which he wants to download. The download of a file is achieved through a direct connection between the computer requesting the file and the computer(s) hosting the file. Once a file has been downloaded, it is stored in the area previously designated by the user and will remain there until moved or deleted. Most of the P2P software applications keep logs of each download event. Often times a forensic examiner, using these logs, can determine the IP address from which a particular file was obtained. Furthermore, as mentioned above, even if a user chooses to delete files from his shared folder, evidence of the deleted files usually can be recovered.

44.  A person interested in sharing child pornography with others in the P2P network need only save those files in his "shared" folder(s). Those child pornography files are then available to all users of the P2P network for download regardless of their physical location.

45.  A person interested in obtaining child pornography could open the P2P application on his computer and conduct a keyword search for files using a term such as "preteen sex." The keyword search would return results of files being shared on the P2P network that match the term "preteen sex." The user can then select files from the search results and those files can be downloaded directly from the computer(s) sharing those files.

46.  The computers that are linked together to form the P2P network are located throughout the world; therefore, the P2P network operates in interstate and foreign commerce. A person that includes child pornography files in his "shared" folder is hosting child pornography and therefore is promoting, presenting, and potentially distributing child pornography. A person that hosts child pornography is in violation of Title 18, United States Code, Section 2252A(a)(3)(B) in that he is promoting and presenting child pornography in interstate and foreign commerce by means of a computer.

47.  One of the advantages of P2P file sharing is that the user can select and download more than one file at a time. In addition, a user may download parts of one file from more than one source computer at a time. For example, a user downloading a video file may actually receive parts of the file from multiple computers. The advantage of this is that it reduces the time it takes to download the file.

48.  A P2P file transfer is accomplished, like all Internet data transmission, by use of an Internet Protocol (IP) address. This address, expressed as four numbers separated by decimal points, is unique to a particular Internet connection during an online session.

The IP address provides a unique location making it possible for data to be transferred between computers.

49. Even though the P2P network links together computers all over the world and users can download files, it is not possible for one user to send or upload a file to another user of the P2P network. The software is designed only to allow files to be downloaded that have been selected. Files are not automatically downloaded to the user's computer, and a person cannot send files from his computer to another user's computer without the other user's knowledge and permission.

50. A forensic examiner can often recover evidence which shows that a computer contains peer to peer software, when the computer was sharing files, and even some of the files which were uploaded or downloaded.

**The eDonkey Network**

51. The P2P network involved in this investigation is the eDonkey network, which is also known as the "eDonkey2000" network, or "eD2k." Users of this network can simultaneously share files with users while downloading files from other users. I know that when a user on the eDonkey network offers a file to trade, the peer to peer software calculates a "hash value" of the file using the hash function known as an MD4 hash. A hash function is a mathematical function which converts the data which comprises the contents of a file into an alpha-numeric value. An example of an MD4 hash value is "86f7e437faa5a7fce15d1ddcb9eae7b8". This value is unique to every file. If any change is made to the file, the MD4 hash value will be completely different.

52. By comparing hash values, one can determine whether two files are identical with a precision that exceeds 99 percent certainty. There has never been a documented occurrence of two different files found on the Internet having different contents while sharing the same MD4 hash value. An MD4 hash value is similar to the fingerprint, or DNA, of a digital file, although MD4 is actually more accurate than DNA.

53. I know that the use of MD4 hash values for the matching of movies and images has proven to be extremely reliable. It is possible to compare the MD4 signatures of files being shared on the network to previously identified MD4 signatures of any file, including child pornography, to determine if the contents of the two files are identical. In other words, through the use of MD4 hash values, an investigator can verify the contents of a file by simply viewing a copy of the file which has the same MD4 hash value.

54. The eDonkey network can be accessed by computers running several different client programs. These programs share common protocols for network access and file sharing. The user interface, features and configuration may vary between clients and versions of the same client. During the default installation of an eDonkey client, settings are established which configure the user's computer to share files. Depending upon the eDonkey client used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed.

55. Typically, a setting establishes the location of one or more directories or folders whose files are made available for distribution to other eDonkey users. An additional setting controls whether or not other users of the network can obtain a list of the files being shared by the user's computer.

56. Other settings control whether or not users will be able to share portions of a file while they are in the process of downloading the entire file. This feature increases the efficiency of the network by putting more copies of file segments on the network for distribution.

57. Files on the eDonkey network are uniquely identified using an MD4 root hash algorithm of an MD4 hash list of the file. The resulting hash value is a modified MD4, also known as an eD2k hash, and is just as accurate as the original MD4 hash alone, as explained above. The eDonkey network uses eD2k hash values, based off of segments or chunks of MD4 hash algorithms, to improve network efficiency. The hash values also ensure that files with identical content but different names are treated as the same file, while files with different contents but the same name are treated as different files.

58. Files located in a user's shared directory are processed by the client software. As part of this processing, a modified MD4, or eD2k root hash value is computed for each file in the user's shared directory. Users may receive a selected file from numerous sources by accepting segments of the file from multiple users and then reassembling the complete file on the local computer. The client program succeeds in reassembling the file from different sources only if all the segments came from exact copies of the same file. The network uses eD2k root hash values to ensure exact copies of the same file are used during this process.

59. The eDonkey client software allows a user to search for pictures, movies and other files by entering descriptive text as search terms. These terms are typically processed by peers based upon the information about the files that had been sent by individual users. Entering search terms into an eDonkey client returns a list of files and descriptive information including, in some client software, the associated eD2k root hash values.

60. A person is able to compare the eD2k root hash values of files being shared on the network to previously identified eD2k root hash values of any file, including child pornography. Using a publicly available eDonkey client, a user can select the eD2k root hash value of a known file and attempt to receive it. Once a specific file is identified, the user can initiate the download process. At that time, a user is presented with a list of users or IP addresses that have recently been identified as download candidates for that file. This allows for the detection and investigation of computers involved in possessing, receiving and/or distributing files of previously identified child pornography.

61. Once this association has been established, an investigator can attempt to download the file from the associated user or view the contents of the shared directory. In order to obtain this list of files, a direct connection between the computers must occur. This list can be a partial listing of the shared files. The file list can only be obtained if the

associated peer is connected to the network and running an eDonkey client at that moment.

62. By receiving either a file list or portions of a download from a specific IP address, an investigator can conclude that a computer is running an eDonkey client and possessing, receiving and/or distributing specific and known visual depictions of child pornography. No specialized law enforcement equipment is required; rather, all of this is accomplished by utilizing functions that are available to any user of an eDonkey client.

**eMule**

63. eMule is a free P2P file sharing application used by individual users on the eDonkey network. Started in May of 2002, eMule connects to the eDonkey network for purpose of file sharing between users. The distinguishing features of eMule are the direct exchange of sources between client nodes, fast recovery of corrupted downloads, and the use of a credit system to reward frequent uploaders. eMule is a publically available program that can be downloaded and installed for free. As of October 2011, it was the most popular download on SourceForge, with over 570 million downloads (source: http://SourceForge.net/top/topalltime.php).

64. I am familiar with an automated software application named NordicMule. NordicMule, also known as "eCrawler," is a software tool based on the eMule software program. NordicMule was originally adapted from eMule by the Norway National Criminal Investigative Service for law enforcement purposes. NordicMule was then modified for law enforcement investigations. Functionality and features were added to create a software tool that more readily identifies computers offering to share files associated with the exploitation of children on the eDonkey network.

65. This application automates the process used by an investigator to search for files available for distribution on the peer to peer network that contain child pornography related terms. The application automatically searches the peer to peer network for files which contain child pornography related search terms by regularly downloading eD2k links (eDonkey magnets) from the peer to peer database. Those links are eD2k file hashes previously viewed by law enforcement and known to be associated with depictions of child sexual abuse. The application identifies what each individual and specific computer is offering for transfer based on IP address. NordicMule ensures that the information acquired is not from multiple sources, but from specific IP addresses at specific dates and times.

66. The NordicMule application then receives information from computers on the peer to peer network about files which are made available by the individual user for download. This information includes the name of the file, the IP address of the computer hosting the file, the date, time and time zone the file was seen on the peer to peer network and the eD2k hash value of the file. The application then compares the hash value of the shared files to the hash values of files which are known to be child pornography. If the hash values of the shared files match the hash values for known child pornography files, the

application logs the name of the file, the IP address of the computer hosting the file, the date, time and time zone and the eD2k hash value of the file. This information is then automatically sent to the peer to peer database. All information submitted to the peer to peer database is the result of individual peer computers responding to a request from NordicMule and the information that is logged to the peer to peer database contains the police officer's license number.

67. Cooperating law enforcement agencies have pooled their information to assist in identifying criminal conduct and build probable cause to further criminal investigations. With this pooled information law enforcement gets a better understanding of the global information available about a suspect that resides in their jurisdiction. This information is valuable when trying to regionalize a suspect to a certain jurisdiction, given the global scope of the Internet.

68. Investigators from around the world gather and log information regarding child pornography trading on the peer-to-peer network and this information is kept in a database for use by law enforcement (hereinafter "peer to peer database").

69. When an investigator logs onto the P2P network and enters search terms used by traders of child pornography, the investigator identifies a file that he or she believes to be child pornography. The investigator then looks at or "browses" the contents of the shared folder to examine other files which the other user is currently sharing. This "browse" function confirms that the particular computer is on-line and sharing files at that moment. The investigator then initiates a download of the child pornography file. Once the investigator begins to download the file from that user, any other computers which are also sharing the same child pornography file (as determined by an identical hash value) are identified and the software logs information pertaining to those computers including the IP address of each computer, the date and time and time zone that the child pornography file was shared by each computer, the hash value of the child pornography file and the file name of the child pornography file. This information is then automatically sent to the peer to peer database. Therefore, there is a historical record of computers that have offered that child pornography file for download.

70. The investigation of peer-to-peer file sharing networks for evidence of child pornography crimes is a cooperative effort of law enforcement agencies around the country. Many of the officers involved in this effort are using the technology and methods described herein. This methodology has led to the issuance and execution of search warrants around the country resulting in many seizures of child pornography and arrests for possession and distribution.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

71. Although automated on-scene search tools can extract a significant amount of data, searches and seizures of evidence from computers commonly require agents to seize most or all computers and computer-related media, to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

    a. Those who possess child pornography on a computer often transfer copies of the illicit files onto removable storage devices like external hard drives, CDs / DVDs, and USB thumb drives. These devices, though sometimes very small, can store the equivalent of thousands of pages of information. Extracting and searching the files stored on these devices can be time consuming.

    b. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order and with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on-site or even within the period specified for execution of the search warrant.

    c. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computers and computer-related media available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password protected, or encrypted files. Although it is not always necessary, because computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is ideal for a complete and accurate analysis.

## BACKGROUND OF THE INVESTIGATION

72. On 12/04/12, I was notified by Madison County Sheriff's Deputy Brian Koberna that IP address **24.107.221.91** had been observed on the eDonkey P2P network on 11/15/12 at 8:47:00 (GMT) sharing files believed to contain child pornography.

73. Deputy Koberna determined that the IP address **24.107.221.91** belonged to Charter Communications and obtained a Madison County-issued subpoena to determine the registered subscriber.

74. In response to the subpoena, Charter Communications provided information that, from 06/02/12 at 21:26:41 (GMT) until 11/18/12 at 18:39:47 (GMT), the IP address

24.107.221.91 was registered to Chris Hill at **1232 Harrison St., Edwardsville, IL 62025**. The complete response was as follows:

| | |
|---|---|
| Account No: | 8345782080055429 |
| Account Holder: | Chris Hill |
| Service Address: | 1232 Harrison St.<br>Edwardsville, IL 62025447 |
| Billing Address: | 1232 Harrison St.<br>Edwardsville, IL 62025447 |
| Service Number(s) | 618-692-1881 |
| Modem MAC: | bc:c8:10:2c:ac:f2 |
| CPE MAC: | a0:21:b7:7d:e4:e5 |

75. I checked the peer to peer database and discovered that the software program NordicMule had also logged data from a computer in Illinois using the IP address **24.107.221.91** to offer child pornography files for download. The information logged pursuant to this procedure included the ED2K hash value of the file, the IP address of the computer which was sharing the file, and the date, time and time zone that the file was offered for trade. This information was automatically sent to the peer to peer database by the method outlined above.

76. The following is a partial list of files logged by NordicMule pertaining to IP address **24.107.221.91**:

1) Filename: **Bondaged Girl Blowjob Creampie.mpg**
ED2K hash: C56ADD0B64317E135D14876E803E0209
Date: 10/17/12 at 6:13 (GMT), 09/07/12 at 11:21 (GMT), 09/02/12 at 9:12 (GMT), 06/29/12 at 6:45 (GMT)

2) Filename: **Jho - Youngfriends (Pthc) (Kinderkutje).mpg**
ED2K hash: 1E2C5D09836FAAA286CC0E9BBCD0595E
Date: 11/10/12 at 5:23 (GMT)

3) Filename: **R@Ygold Hussyfan Liluplanet Cristi 10Yr Early Beginnings.avi**
ED2K hash: BA58A26345D46F82E390559149AE5158
Date: 11/10/12 at 5:45 (GMT)

4) Filename: **Jho 7 Karen Again Kleuterkutje.mpg**
ED2K hash: 3526EEB621390A17741BAB5DCE04FF9B
Date: 11/09/12 at 8:32 (GMT)

5) Filename: **Falko Family Study (17m59s).mpg**
ED2K hash: 420A9989028D24A9AC3CD35CC1DCF6EA
Date: 11/03/12 at 5:19 (GMT)

77. I sent a list of the files observed by NordicMule to Special Agent David Wargo with the Illinois State Police. Using the associated hash values, Special Agent Wargo was able to find and view the above-listed files and confirmed that they constitute child pornography as defined in 18 U.S.C. § 2256(8)(A). Special Agent Wargo provided the following descriptions for the files listed above:

1) Filename: **Bondaged Girl Blowjob Creampie.mpg**
ED2K hash: C56ADD0B64317E135D14876E803E0209

This video file contains audio and is 18 minutes and 55 seconds in length. Part of a series of child pornography known to law enforcement as the "Vicky" series, this video depicts a nude female juvenile approximately 10 years old, kneeling while she has her hands bound with rope, and another rope binding her feet to her neck. She is wearing a mask that covers her eyes. The female has no pubic hair or breast development. During the course of this video the female is forced to perform oral sex on a male adult. The female is then repositioned onto a bed laying on her back with her legs, spread apart and bound by rope. The adult male then performs oral sex on her vagina while he penetrates her anus with a sex toy. The adult male also places his erect penis around her anus and vagina, and possibly inserts his penis into her anus, but his body and hands block that view.

2) Filename: **Jho - Youngfriends (Pthc) (Kinderkutje).mpg**
ED2K hash: 1E2C5D09836FAAA286CC0E9BBCD0595E

This video is 48 minutes and 14 seconds long and consists of a compilation of numerous videos. It starts by showing a young teen female undressing with a title displayed "Jack h'Off Young Friends." The video cuts to another scene and shows a naked prepubescent juvenile female in bed, partially covered with a blanket. The child's vagina and anus are visible and the camera zooms in on her genitals. The video continues and shows an adult male masturbating while spreading the prepubescent juvenile female's vagina apart. The juvenile female is heard crying in the background. The male then has vaginal intercourse with the prepubescent juvenile female and ejaculates onto her vagina. The video then cuts to several scenes containing what appears to be adult pornography. The video cuts to another scene and shows the camera operator taking off the panties from a prepubescent juvenile female. The male operator is seen digitally penetrating the juvenile female's vagina. The video contains several other scenes depicting juvenile females engaged in sexual activity.

3) Filename: **R@Ygold Hussyfan Liluplanet Cristi 10Yr Early Beginnings.avi**
ED2K hash: BA58A26345D46F82E390559149AE5158

This file is a color digital video that is approximately 28 minutes and 18 seconds in length. The video depicts a nude prepubescent female child inserting a pencil in her genital area and anal area. The female child then has oral sex with an adult male. The adult male ejaculates onto the female child's genitals.

4) Filename: **Jho 7 Karen Again Kleuterkutje.mpg**
ED2K hash: 3526EEB621390A17741BAB5DCE04FF9B

This is a 5 minute and 50 second color video depicting two prepubescent females performing oral sex on each other. The video also depicts a close up of a female child urinating on the floor of a bathroom with the camera focused on the exposed vagina. The females in the video are approximately 4-7 years old.

5) Filename: **Falko Family Study (17m59s).mpg**
ED2K hash: 420A9989028D24A9AC3CD35CC1DCF6EA

This 17:59 video file starts with a small child approximately 1 year old nude lying nude on the floor with an adult female who is also nude. The adult female is playing with the child's vaginal area and then allows the child to play with her vaginal area. The adult female is kissing the child on the mouth and getting the child to sit on her chest. The video then goes to a nude adult male lying on the floor licking the child on her legs. The video then goes to the adult female holding the nude child while the adult male masturbates. The video then goes to the adult female and child in the bathtub, the adult is kissing the child on the body and vaginal area while the adult male videotapes. While the female is touching the child's vaginal area, the adult male is masturbating. The adult male then begins to lick on the child's body and buttocks area. The video ends with the child walking around nude.

78. On 01/08/12, at approximately 3:30 pm, I photographed the residence at 1232 Harrison Street, Edwardsville, Illinois (see Attachment A). There was a white Ford F150 parked in the street directly in front of the residence with Illinois registration 12398Y. A registration check on the vehicle shows that it is registered to Christopher Hill, 1232 Harrison Street, Edwardsville, Illinois. I also observed a subject I recognized as Chris Hill standing in the front yard with a small dog on a leash.

79. On 01/09/13, I conducted a wireless network search from the public roadway in front of the residence at 1232 Harrison Street, Edwardsville, Illinois. There are multiple wireless networks in the area within range of 1232 Harrison Street that are secured, which means a password is needed to access the network. I located an open wireless network with the name of "Jumpstart-P1-dae194" within range of 1232 Harrison Street.

80. A check of Edwardsville Police Department records was conducted and a report accusing Chris Hill of a sexual assault/abuse was located. The report is Edwardsville case number 12001659 and is dated 03/16/12. The victim, "A.C." (W/F, DOB: [redacted]/89), made a report to the Athol Police Department in Athol, Massachusetts, which is where A.C. currently resides. A copy of a written statement from A.C. was faxed to the Edwardsville Police Department. The written statement is a follows:

*When I [A.C.] was seven years old I moved into my aunt and uncles house. My aunt's name is Kay Hill and my uncle is Christopher Hill. The address where they live is 1232 Harrison Ave, Edwardsville, IL 62025. Between the ages of seven and ten, my uncle*

*Chris began molesting me. The first time I remember this happening I was taking a bath and once I began to drain my bath water he walked into the bathroom. He told me that he wanted to make sure I had cleaned myself properly. He put me on the bathroom sink, still completely naked. He opened my legs to look am my vagina. He then had a washcloth and was touching my clitoris with it still claiming to be cleaning me. This same type of thing happened multiple times after I took baths. Usually during the time this was happening no one else was in the house. I became really nervous to take baths so I tried to shower in the basement, but he still came into the bathroom there too. He was always very secretive and tried to convince me he was helping me with my hygiene. I can not remember the exact amount of times this happened but it stopped before I reached puberty. I believe I was ten when it ended. Another instance I remember, I was again taking a bath and my uncle came into the bathroom when I was finished. Before I could even get a towel he told me to go into his bedroom. He made me sit on the bed and he told me he was going to teach me how to use a tampon. I was completely naked and he had a video camera. He told me that the camera was not recording but I can not be sure. He made me open my legs and put the video camera in from of my vagina. He turned the screen towards me so I would have to look at myself. He then inserted a tampon into my vagina. No one was in the house at the time besides the two of us. I also remember sleeping on the floor in my living room and I woke up and my uncle was laying behind me. I have no idea what he was doing, but when I woke up he got up and left. I cannot recall the number of times these things happened, but I believe I was between the ages of seven and ten when it was going on. I have had trouble recalling the length of time because my uncle hid the molestation by trying to convince me he was teaching me something. This caused me an extreme amount of anxiety and denial. I never told anyone what happened while I was living with my aunt and uncle when I was 18 and moved out. I told my biological parents and I later wrote a letter to Kay explaining to her what happened. She denied that any of the things my uncle did were molestation. I have another aunt, [redacted], who suspected something was going on because when she was younger my uncle Chris (her older brother) did something to her as well. When I was in high school she called the Department of Child Services and they came to my home. They asked me if my uncle had done anything to be but I denied it at the time. I am not sure if my Aunt Kay knew or has any idea of what happened to me while I was living at her house.*

## INFORMATION BASED UPON TRAINING AND EXPERIENCE

81. Based upon my training and experience, I know the following to be true:

a. Those who have possessed and/or disseminated child pornography usually have an interest or preference in the sexual activity of children. Those who have demonstrated an interest or preference in sexual activity with children or in sexually explicit visual images depicting children are likely to keep secreted, but readily at hand, sexually explicit visual images depicting children. In some instances, these depictions are actual photographs or images of the suspect's own sexual activity with past or present children. In some instances, the suspect keeps these depictions as a means of plying, broaching, or titillating the sexual interests of new child victims or otherwise lowering the inhibitions of other potential child sexual partners by showing them that other children participate in this kind of activity. Still, in other instances, the depictions are a means of arousing the suspect. These depictions tend to be extremely important to such individuals and are likely to remain in the possession of or under the control of such an individual for extensive time periods. Although he might, a person who has this type of material is not likely to destroy the collection. Even if the illicit files were deleted by a user, they still may be recoverable by a trained computer forensic examiner. These sexually explicit visual images depicting children can be in the form of, but are not limited to, negatives, slides, books, magazines, videotapes, photographs or other similar visual reproduction, and digital image or video files.

b. Persons trading in, receiving, distributing or possessing images or movies of child pornography often have copies of those files on their computer's hard drive or computer-related media such as CDs and USB thumb drives. Such removable storage devices are more portable than a computer and are sometimes found in a subject's automobile, a briefcase or purse, or another location where they can be readily taken out of the subject's residence.

c. Persons trading in, receiving, distributing or possessing images involving the exploitation of children often take precautions to ensure that their contraband is not discovered. Such precautions can be something as simple as hiding computers or computer-related media in non-obvious locations within a residence, an outbuilding, an automobile, or elsewhere within the curtilage of the property. More sophisticated steps, such as intentionally mislabeling items, encrypting files or file containers, or concealing the images within other, seemingly innocuous files, can also be taken.

d. Persons trading in, receiving, distributing or possessing images involving the exploitation of children or those interested in the actual exploitation of children often communicate with others through correspondence or other documents (whether digital or written) which could tend to identify the origin of the images as well as provide evidence of a person's interest in child pornography or child exploitation.

e. Non-pornographic, seemingly innocuous images of minors are often found on media containing child pornography. Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant. In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

f. Files related to the exploitation of children found on computers are usually obtained from the Internet using application software which often leaves files, logs or file remnants which would tend to show the exchange, transfer, distribution, possession or origin of the files.

g. Computers used to access the Internet usually contain files, logs or file remnants which would tend to show ownership and use of the computer as well as ownership and use of internet service accounts used to access the internet.

h. Search warrants of residences involved in computer-related criminal activity usually produce items that would tend to establish ownership or use of computers and ownership or use of any internet service accounts accessed to obtain child pornography to include credit card bills, telephone bills, correspondence and other identification documents.

i. Search warrants of residences usually reveal items that would tend to show dominion and control of the property searched, to include utility bills, phone bills, correspondence, rental agreements and other identification documents.

## CONCLUSION

82. Based upon the above, there is probable cause to believe that there is now concealed on the property located at 1232 Harrison Street, Edwardsville, Illinois (see **Attachment A**) certain items as described in **Attachment B** that constitute instrumentalities and evidence of the commission of a criminal offense, or are contraband, in violation of Title 18, United States Code, §§ 2252 and 2252A.

83. I respectfully request that the Court issue a warrant and order of seizure authorizing the search of 1232 Harrison Street, Edwardsville, Illinois , more fully described in **Attachment A**, and a further search for those items listed in **Attachment B**. Said Attachments will be attached to the warrant.

## REQUEST FOR SEALING

84. I further respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing these documents is necessary because they pertain to an ongoing investigation. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate,

e.g., by posting them publicly online through various forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness, as well as the safety of the officers who execute the warrant.

Respectfully submitted,

Michael Lybarger, Special Federal Officer
United States Marshals Service

Subscribed to and sworn before me this 15th day of January, 2013.

Donald G. Wilkerson
United States Magistrate Judge

AUSA Nathan D. Stump

**ATTACHMENT A**

**DESCRIPTION OF THE PREMISES TO BE SEARCHED**

The residence and curtilage located at 1232 Harrison Street, Edwardsville, Illinois, 62025, (see photograph attached below), including an outbuildings, vehicles, and any computers or computer-related media found on the premises. The residence is further described as a single family, multi-level residence. The numbers "1232" are visible on the mailbox next to the front porch, and the residence has a brown/reddish-brown brick front with white siding on the upper level windows. The front door is brown, and there are white-trimmed windows with black shutters. To the rear of the residence, there is a detached wooden garage with white and red trim. The front door of the residence faces Harrison Street. A white Ford F150 pickup truck bearing Illinois license plate 12398Y is typically parked in front of the residence.

Photographs of the subject premises:





## ATTACHMENT B

## DESCRIPTION OF PROPERTY TO BE SEIZED

1. Any and all computers and computer-related media, as defined herein.

2. Any and all records, documents, and materials pertaining to any visual depiction of a minor engaging in sexually explicit conduct, child pornography, child erotica, a sexual interest in children, or sexual activity involving children.

3. Any and all records, documents, and materials pertaining to any minor who is, or appears to be, the subject of any visual depiction of a minor engaging in sexually explicit conduct, child pornography, child erotica, a sexual interest in children, or sexual activity involving children.

4. Any and all records, documents, and materials that concern any internet accounts or internet-related activity capable of containing or concealing evidence of a visual depiction of a minor engaging in sexually explicit conduct, child pornography, child erotica, a sexual interest in children, or sexual activity involving children.

5. Any and all records, documents, and materials evidencing possession, use, or ownership of any of the premises to be searched or property to be seized.

6. Any and all data security devices or other computer software that may be utilized to create, receive, distribute, store, modify, conceal, or destroy any of the evidence sought.

In the execution of this warrant, the agents may seize all computers and computer-related media to be searched later by a qualified examiner in a laboratory or other controlled environment.